INDIANA & MICHIGAN POWER COMPANY v PUBLIC SERVICE
COMMISSION

1. Licenses—Public Utilities—Holding Companies—Subsidiaries—
   Securities—Intrastate Commerce—Securities and Ex-
   change Commission—Federal Statutes.

   A section of the Public Utilities Holding Company Act which
   exempts certain public utility holding company subsidiaries
   from the jurisdiction of the Securities and Exchange Commis-
   sion does not require a subsidiary to transact the bulk of its
   business in intrastate commerce before it may qualify for
   exemption (49 Stat 814 [1935]; 15 USC 79f[b]).

2. Licenses—Securities and Exchange Commission—Public Utili-
   ties—Holding Companies—Subsidiaries—Securities—Fed-
   eral Statutes.

   The Securities and Exchange Commission may attach such terms
   and conditions as it deems appropriate to the issue and sale of
   any security by a subsidiary of a registered public utility
   holding company, although the subsidiary is exempt from
   exclusive Federal securities regulation (49 Stat 814 [1935]; 15
   USC 79f[b]).

3. Licenses—Securities—Restrictions—State-Federal Conflict.

   Federal restrictions on securities issues prevail when a conflict
   arises with state restrictions.

4. Public Service Commissions—Public Utilities—Securities—
   Rates and Services—Interstate Commerce—Federal Power
   Commission—Statutes.

   Michigan's regulation of the issuance of securities by public
   utilities is ancillary to the state's regulation of the rates,
   services, and facilities of public utilities; therefore, the Michi-
   gan Public Service Commission does not have jurisdiction over
   the issuance of securities by a power company where the power

References for Points in Headnotes

[1, 2] 64 Am Jur 2d, Public Utilities §§ 11, 187.
   68 Am Jur 2d, Securities Regulation—State § 73.
[3] 64 Am Jur 2d, Public Securities and Obligations § 279.
[4] 64 Am Jur 2d, Public Securities and Obligations § 107.

company is a seller of electricity at wholesale in interstate commerce and where the rates, services, and facilities of the power company are subject to the exclusive regulatory jurisdiction of the Federal Power Commission (49 Stat 847, *et seq.* [1935]; 16 USC 824, *et seq.*, MCLA 460.6, 460.301; MSA 22.13[6], 22.101).

Appeal from the Court of Claims, Julian E. Hughes, J. Submitted June 7, 1976, at Lansing. (Docket No. 25395.) Decided November 22, 1976.

Complaint in the Court of Claims by Indiana & Michigan Power Company against the Michigan Public Service Commission for a refund of fees paid to the state in connection with the issuance of securities. Judgment for plaintiff. Defendants appeal by leave granted. Affirmed.

*Cummins, Butler & Thorburn* (by *Albert J. Thorburn* and *James R. Anderson),* for plaintiff.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Walter V. Kron* and *Robert J. Taube,* Assistants Attorney General, for defendant.

Before: BASHARA, P. J., and M. F. CAVANAGH and D. T. ANDERSON,* JJ.

M. F. CAVANAGH, J. On leave granted, the State of Michigan and Michigan Public Service Commission (Commission) appeal from an August 4, 1975, judgment of the Court of Claims granting a refund of $431,500 to plaintiff Indiana & Michigan Power Company (Power Company), representing fees paid by Power Company under protest to the Commission in connection with the issuance of Power Company's securities. Although this case was con-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

solidated with No. 25354, *Michigan Gas Storage Co v Public Service Commission,* 72 Mich App 384; 249 NW2d 422 (1976), the differences in applicable Federal statutory provisions mandate treatment by separate opinions.

Power Company is a Michigan corporation organized solely to acquire, construct, and operate the Donald C. Cook Nuclear Electric Generating Plant located near Bridgman, Michigan. To finance this undertaking, Power Company proposed to issue securities in amounts aggregating about one half billion dollars. Recognizing the facial applicability of the Commission's jurisdictional statutes to its securities issues, Power Company filed applications requesting the Commission to disclaim jurisdiction over its securities transactions, or in the alternative, to approve the transactions in the amounts requested.

By orders of May 10, 1971, July 23, 1971, and August 7, 1972, the Commission asserted its jurisdiction over Power Company's securities under MCLA 460.301; MSA 22.101[1] and granted the al-

---

[1] MCLA 460.301; MSA 22.101 provides in relevant part:

"Any corporation or association except municipal corporations, organized and existing, or which may hereafter be organized or authorized to do business under the laws of this state, or any lessee or trustee thereof, or any person or persons owning, conducting, managing, operating or controlling any plant or equipment within this state used wholly or in part in the business of transmitting messages by telephone or telegraph, producing or furnishing heat, artificial gas, light, water or mechanical power to the public, directly or indirectly, and any railroad, interurban railroad or other common carrier, or any corporation, association, or individual exercising or claiming the right to carry or transport natural gas for public use, directly or indirectly, or petroleum oil by or through pipe line or lines or engaged in the business of piping or transporting natural gas for public use, directly or indirectly, or engaged in the business of purchasing natural gas for distribution may issue stocks, bonds, notes or other evidences of indebtedness payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, the construction, completion, extension or improvement of facilities or for the improvement or maintenance of service or for the discharge or lawful refunding of obligations and may issue

ternative request for approval of securities issuance. The Commission required payment of the fee provided for in MCLA 460.61; MSA 22.11[2]. Power Company paid the fees of $431,500 (1/10 of 1% of the face value of the securities authorized), reserving its right to seek a refund. It subsequently sued in the Court of Claims for a refund of the fees, and that court granted relief as requested.

The Donald C. Cook Nuclear Plant is in the process of construction, and when completed will comprise two nuclear generating units. The generating plant is being constructed pursuant to permits granted by the Atomic Energy Commission (reorganized into the Nuclear Regulatory Commission). The plant may not be operated until such time as Power Company has obtained an operating license from the NRC.

stock to represent accumulated earnings invested in capital assets and not previously capitalized: Provided, and not otherwise, That there shall have been secured from the Michigan railroad commission an order authorizing such issue and the amount thereof, and stating that in the opinion of the commission the use of the capital or property to be acquired to be secured by the issue of such stock, bonds, notes or other evidences of indebtedness, is reasonably required for the purposes of such person, corporation or association, or that the issue of such stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized."

[2] MCLA 460.61; MSA 22.11 provides:

"Whenever any stocks, bonds, notes or other evidences of indebtedness are authorized by the commission to be issued in accordance with any law of this state, the party or parties upon whose application said securities are authorized shall before the issuance or sale of said securities, pay into the treasury of the state of Michigan a sum equal to one-tenth of one per cent of the face value of the securities so authorized; the sum so paid not to be less than $50.00 in any case: Provided, That a minimum fee of $5.00 shall be paid by rural telephone companies with respect to the authorization to borrow money: Provided, however, That where the property upon which such stocks, bonds, notes or other securities are authorized to be issued, is located partly within and partly without the state of Michigan, then said fee shall be computed only in such an amount and on such proportion of the entire issue, as the amount of the property of such applicant actually located within the state of Michigan, bears to the total amount of the property upon which such securities are issued."

A further understanding of the involved corporate structures and functions is necessary. All of the outstanding capital stock of Power Company is owned by Indiana & Michigan Electric Company (Electric Company). Power Company is obligated by contract to sell all of its energy at wholesale to Electric Company. The energy will be transported to Indiana and there merged into Electric Company's interstate electric power grid.

Electric Company is an Indiana corporation engaged in the generation, purchase, transmission, distribution and sale of electric energy which it distributes and sells at retail to consumers located in northern and eastern areas of Indiana and the southwestern area of Michigan. By virtue of these retail sales, Electric Company is subject to regulation in both Indiana and Michigan by the respective state public service commissions. In addition, Electric Company purchases and sells electric energy at wholesale to other electric utilities in Indiana, Michigan, Illinois and Ohio. These transactions are subject to the exclusive regulatory jurisdiction of the Federal Power Commission (FPC) under sections of the Federal Power Act, 49 Stat 847, *et seq.* (1935); 16 USC 824, *et seq.*

All of Electric Company's outstanding common stock is held by American Electric Power Company, Inc., (American), a New York corporation. American is a public utility holding company which owns all of the common stock of various electric utility companies operating in Ohio, Indiana, Michigan, Virginia, West Virginia, Kentucky and Tennessee. The facilities of American's subsidiaries are physically interconnected and operated as a single, integrated electric utility system. See *Indiana & Michigan Electric Co v Federal Power Commission,* 365 F2d 180 (CA 7, 1966).

As in the companion case of *Michigan Gas Storage Co,* we begin with an examination of the state-Federal regulatory framework. As a seller of electric energy in interstate commerce at wholesale, Power Company is also subject to the exclusive regulatory jurisdiction of the FPC. The FPC authority includes rates [49 Stat 851 (1935); 16 USC 824d], interconnection and coordination of facilities [49 Stat 848 (1935); 16 USC 824a], and the furnishing of service [49 Stat 853 (1935); 16 USC 824f]. This congressional allocation of regulatory jurisdiction precludes the Commission from regulating these aspects of Power Company's operations. It is settled law that congressional ordering of authority over this area of interstate commerce is binding upon the states.

As a subsidiary of a public utility holding company, Power Company is subject to the Federal Securities and Exchange Commission's (SEC) authority over issuance of its securities, under §§ 2 and 6a of the Federal Public Utility Holding Company Act (PUHCA), 49 Stat 804, 814 (1935); 15 USC 79b, 79f(a). Power Company filed declarations with respect to these securities issues with the SEC, and after appropriate proceedings, the SEC issued orders permitting the declarations to become effective.

Congress did not intend to occupy the entire field of public utility securities regulation. Section 6(b) of the PUHCA; 49 Stat 814 (1935); 15 USC 79f(b), creates an exemption from SEC jurisdiction over securities issues of holding company subsidiaries:

"The Commission by rules and regulations or order, subject to such terms and conditions as it deems appropriate in the public interest or for the protection of investors or consumers, shall exempt from the provi-

sions of subsection (a) of this section the issue or sale of any security by any subsidiary company of a registered holding company, if the issue and sale of such security are solely for the purpose of financing the business of such subsidiary company and have been expressly authorized by the State commission of the State in which such subsidiary company is organized and doing business".

Power Company argues that the § 6(b) exemption must be limited to companies engaged in wholly intrastate business. The nature of Power Company's interstate transactions would then preclude application of the 6(b) exemption, leaving the SEC as the sole regulatory authority over Power Company's securities, as intended by the congressional scheme set forth in the PUHCA. Where Congress has left room for state authority via an exception to an otherwise complete Federal regulatory scheme, the inapplicability of the exception would be conclusive evidence of the congressional purpose to preempt state regulation. Although this argument has some support, *e.g., Great Lakes Transmission Co v Michigan Public Service Commission,* 24 Mich App 77; 180 NW2d 59 (1970), we cannot agree.

The language of the exemption contains no requirement that the regulated company transact the bulk of its business intrastate; rather, an exemption geared to business of an intrastate character is found in a different section of the PUHCA, § 3(a)(1); 49 Stat 811 (1935); 15 USC 79c(a)(1).[3] The presence of § 3(a)(1) makes it un-

---

[3] PUHCA § 3(a); 49 Stat 810 (1935); 15 USC 79c(a) provides in part:

"(a) The Commission, by rules and regulations upon its own motion, or by order upon application, shall exempt any holding company, and every subsidiary company thereof as such, from any provision or provisions of this chapter, unless and except insofar as it finds the exemption detrimental to the public interest or the interest of investors or consumers, if—

"(1) such holding company, and every subsidiary company thereof

likely that Congress intended to restrict § 6(b) to business of intrastate character. Moreover, the SEC has applied § 6(b) to power utilities that have substantial business in more than one state. *Matter of Wisconsin Michigan Power Co*, 2 SEC 933 (1937).

In rather convoluted fashion, § 6(b) of the PUHCA creates concurrent regulatory jurisdiction in the SEC to control subsidiaries' securities issues. Although the exemption from exclusive Federal securities regulation is "mandatory", *i.e.*, if a subsidiary's securities issue has been authorized by a state public service commission, the SEC "shall" grant a § 6(b) exemption, the statute explicitly provides the SEC the authority to attach "such terms and conditions as it deems appropriate in the public interest or for the protection of investors or consumers". In a case similar to this one, the SEC granted a § 6(b) exemption to a company formed to build and operate a nuclear electric generating plant which would be integrated into an interstate electric power grid. In granting the exemption, the SEC noted that,

"the appropriate State commissions have approved the proposed [securities] acquisitions and that the Federal Power Commission ("FPC") has regulatory jurisdiction over * * * [the nuclear power company]. Issues with respect to wholesale supply of power, applicable rates, and charges of discrimination thereunder, are subject to regulation and review by the FPC * * * .

"In approving the issue and acquisition of securities

which is a public-utility company from which such holding company derives, directly or indirectly, any material part of its income, are predominantly intrastate in character and carry on their business substantially in a single State in which such holding company and every such subsidiary company thereof are organized".

Since American and Electric Company are not predominantly intrastate in character, this exemption does not affect Power Company.

we may under Sections 6(b) and 10(e) [of the PUHCA] prescribe such conditions as we find necessary or appropriate in the public interest or for the protection of investors or consumers.

\* \* \*

"Insofar as Section 6(b) is concerned, that Section like Section 7 is concerned with the issue and sale of securities by a registered holding company or a subsidiary company thereof. Our jurisdiction under these provisions, as we recently stated, extends to the type, amount, price and other terms of securities proposed to be issued". *Matter of Vermont Yankee Nuclear Power Corp,* 43 SEC 693, 699–701 (1968).

The statute purports to provide a mandatory exemption, but backhandedly; its conditional language grants concurrent securities regulatory jurisdiction to the SEC. Should a conflict arise between Federal and state restrictions on the securities issue, it seems clear that the Federal command is intended to prevail.[4]

---

[4] The SEC has convincingly construed the § 6(b) exemption:

"The legislative history of the Act shows that the third sentence of Section 6(b) was inserted in the Act by the Conference Committee as a compromise between the provisions of the Senate Bill (S.2796) and the House Amendment thereto. The Senate Bill made the standards of Section 7 regarding the issue and sale of securities equally applicable to both registered holding companies and all of their subsidiaries. The House Admendment made these standards applicable only to registered holding companies and 'to any subsidiary company thereof which is a public utility company the issuance of whose securities is not subject to regulation by a State commission or State securities commission.' In commenting on the compromise the Conference Report stated:

"The substitute agreed upon is the language of the Senate bill which is qualified by a provision in Section 6(b) which directs the Commission to exempt the issue of securities by subsidiary companies in cases where holding company abuses are unlikely to exist. [H.R. Rep. No. 1903, 74th Cong, 1st Sess, pp. 66–67.]

"It seems obvious that the compromise embodied in Section 6(b) was intended to grant greater responsibility and vest a larger measure of regulatory power in this Commission than had been provided for in the House Amendment. First, unlike the House Amendment, the compromise did not grant an automatic exemption; second, it directed this Commission to grant an exemption from the requirements of

This scheme functions rationally in the context of public utility holding company subsidiaries

Sections 6(a) and 7, only if the State commission had expressly 'authorized' the issue, whereas the House Amendment granted a statutory exemption if the issue was 'subject to regulation by a State commission'; and, third, and most important, it expressly made the granting of such exemption 'subject to such terms and conditions' as the Commission deemed 'appropriate in the public interest or for the protection of investors or consumers.' These differences show that the compromise not only limited the scope of the Section 6(b) exemption, but also contemplated that the security issues of all subsidiary companies, even though approved by state regulatory agencies, should be subject to this Commission's consideration and to the imposition of such terms and conditions as this Commission finds appropriate 'in the public interest or for the protection of investors or consumers' in order to prevent the likelihood of abuses which Congress found prevalent in holding company systems.

"Thus, while Section 6(b) falls short of the Senate provision which would have granted to this Commission the same regulatory power over securities of operating companies approved by state regulatory agencies as over the issues of holding companies which are subject to Section 7, it is clear that, by rejecting the House provision, Congress meant to impose some affirmative power and responsibility in this Commission in connection with Section 6(b) financings. Accordingly, it appears that the scope of this Commission's power under Section 6(b) falls somewhere between an unqualified acceptance of state approval on the one hand, and the plenary regulation of Section 7 on the other. Congress apparently contemplated that the responsibility for the examination of security issues of operating companies subject to state regulation should be divided between this Commission and the state agencies and that the combined supervision of both authorities would produce the regulation envisaged by the Holding Company Act. Thus this Commission would afford additional protection where the state agency has not provided the measure of protection which the Act seeks to assure. In determining the effect and nature of the protection which Congress sought to provide and the evils which it sought to eliminate, reference must be made first to Section 1(b) of the Acxt which describes generally the type of abuse which made necessary the enactment of remedial legislation and, second, to the policy of the statute as given expression in the various provisions of the Act.

"We are not insensitive to the delicate questions created by the dual regulation of state and federal authority. We think it possible, however, under Section 6(b) to give all due respect and effectiveness to the determination of the state authority and at the same time fulfill the statutory responsibility imposed on this Commission. We believe the legislative scheme and purpose can be fully effectuated if our power to impose terms and conditions in connection with an issue approved by a state agency is employed only after giving weight to the decision of the state agency and then only to the extent that the issue offends the basic standards and policies of the Act and thereby creates the likelihood of those abuses which led to passage of the Act.

which provide services directly to the public. The state retains primary control over retail rates, services, and facilities of these power utilities and correlatively, over their securities issues. The Congress through the PUHCA provides a backup regulatory scheme to prevent abuses through manipulation of public utility holding companies.

However, we find it unlikely that Congress envisioned piecemeal state regulation of securities issues of utilities whose rates, services, and facilities are exclusively regulated by the FPC. Although the SEC in *Vermont Yankee Nuclear Power Corp, supra,* seemed to assume that state regulation in such a context is proper, the propriety of state regulation was not raised before it. Although we find it unnecessary to reach the constitutional preemption issue, we harbor grave doubt that Congress intended the states to share regulatory jurisdiction over such a limited yet crucial zone on the interstate public utilities sector.[5]

A preemption holding is unnecessary, for we

---

In effect this means that a greater degree of latitude is permitted in applying the standards and policies of the Act to a security examined and approved by a state commission and entitled to a Section 6(b) exemption than to an issue subject to all provisions of Section 7, but where there is a material variance from those standards and policies, it is our responsibility, despite state approval, to impose appropriate terms and conditions." *Matter of Public Service Company of Indiana, Inc,* 26 SEC 338, 348–350 (1947).

[5] In its statement of purpose behind the PUHCA, the Congress condemned the abuses which could result "when * * * securities are issued without the approval or consent of the States having jurisdiction over subsidiary public-utility companies". Section 1(b), PUHCA; 49 Stat 803 (1935); 15 USC 79a(b). The Congress thus intended to enhance state regulation of public utility companies which were then subject to state regulatory jurisdiction. However, in 1935, the year of enactment of the PUHCA, it was well settled law that the states were precluded from regulatory jurisdiction over electric utilities whose energy was sold at wholesale in interstate commerce. Congress meant to recognize and make effective the state regulation of electric utilities active in local retail distribution, not to permit state interference in regulation of interstate electric utilities subject to exclusive FPC jurisdiction over rates and services.

find, as in *Michigan Gas Storage Co v Public Service Commission,* that the Michigan Legislature intended securities regulation in MCLA 460.301; MSA 22.101 to be ancillary to the Commission's regulatory jurisdiction over rates, services and facilities pursuant to MCLA 460.6; MSA 22.13(6).

The rates and services of a generating facility are intimately related to its capital structure. *Great Lakes Transmission Co v Michigan Public Service Commission, supra.* Congress expressly recognized this interconnection as a prime factor in the inability of state and Federal governments to control public utilities' rates and services when they lacked authority over the companies' capital structures.[6]

---

[6] In its finding of necessity to enact the PUHCA, the Congress declared:

"Upon the basis of facts disclosed by the reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session), the reports of the Committee on Interstate and Foreign Commerce, House of Representatives, made pursuant to H. Res. 59 (Seventy-second Congress, first session) and H.J. Res. 572 (Seventy-second Congress, second session) and otherwise disclosed and ascertained, it is declared that the national public interest, the interest of investors in the securities of holding companies and their subsidiary companies and affiliates, and the interest of consumers of electric energy and natural and manufactured gas, are or may be adversely affected—

"(1) when such investors cannot obtain the information necessary to appraise the financial position or earning power of the issuers, because of the absence of uniform standard accounts; *when such securities are issued without the approval or consent of the States having jurisdiction over subsidiary public-utility companies;* when such securities are issued upon the basis of fictitious or unsound asset values having no fair relation to the sums invested in or the earning capacity of the properties and upon the basis of paper profits from inter-company transactions, or in anticipation of excessive revenues from subsidiary public-utility companies; *when such securities are issued by a subsidiary public-utility company under circumstances which subject such company to the burden of supporting an overcapitalized structure and tend to prevent voluntary rate reductions;*

"(2) when subsidiary public-utility companies are subjected to excessive charges for services, construction work, equipment, and materials, or enter into transactions in which evils result from an absence of arm's-length bargaining or from restraint of free and independent competition; when service, management, construction, and other con-

The regulatory task of the Commission under MCLA 460.301; MSA 22.101 requires a judgment as to whether use of the capital involved is "reasonably required for the purposes of such * * * corporation". The Commission must judge the "necessity" of the funds "for acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement or maintenance of service". Given the exclusive Federal jurisdiction of the FPC over Power Company's operations, state regulation of securities issues could at best minimally interfere with Federal regulatory requirements. It would be at cross purposes with this state's legislative policy as evidenced in MCLA 460.301; MSA 22.101 to vest rate regulation in one body and securities regulation in another. The Commission exceeded its jurisdiction in its attempts to regulate Power Company's securities issues.

Our conclusion that the Commission lacked regulatory jurisdiction compels a refund of the fee collected under authority of MCLA 460.61; MSA 22.11.

The judgment of the Court of Claims is affirmed. No costs.

---

tracts involve the allocation of charges among subsidiary public-utility companies in different States so as to present problems of regulation which cannot be dealt with effectively by the States;

"(3) *when control of subsidiary public-utility companies affects the accounting practices and rate, dividend, and other policies of such companies* so as to complicate and obstruct State regulation of such companies, or when control of such companies is exerted through disproportionately small investment;

"(4) when the growth and extension of holding companies bears no relation to economy of management and operation or the integration and coordination of related operating properties; or

"(5) *when in any other respect there is lack of economy of management and operation of public-utility companies or lack of efficiency and adequacy of service rendered by such companies, or lack of effective public regulation, or lack of economies in the raising of capital."* (Emphasis added.) Section 1(b), PUHCA; 49 Stat 803 (1935); 15 USC 79a(b).